474 So.2d 1269 (1985)
EXXON CORPORATION, U.S.A., Appellant,
v.
Judy DUNN, Individually and As Next Friend to Melissa Godwin and Stacy Godwin; Philip Dunn, Individually and As Next Friend to Kelly Dunn and Shari Michelle Dunn; and James Dunn, Appellees.
No. BD-190.
District Court of Appeal of Florida, First District.
September 10, 1985.
*1270 Alan C. Sundberg and Sylvia H. Walbolt, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tallahassee, for appellant.
Charles J. Kahn, Jr., of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, Pensacola, for appellees.
WIGGINTON, Judge.
Exxon Corporation brings this appeal from a final judgment holding it liable for both personal and property damages arising from the operation of its "separation" plant, found to be a permanent nuisance. We affirm in part and reverse in part.
The facts upon which this case arose are set out below.
During the latter part of 1973, Judy Godwin began construction of her home. During March or April of 1974, Exxon began construction of a "separation" plant 700 feet north of the homesite. In November of 1974, Judy and her two children, Melissa and Stacy, moved into the home; in January, 1975, operations began at the Exxon plant. Judy later testified that following the beginning of plant operation, noise, vibration, and sulphurous odors emanated from the round-the-clock operations of the plant. She also stated that on occasions whistles would blow loudly and steam would be released for hours. As a result, she and her daughter, Melissa, suffered continually from "dull" headaches, varying in degree of intensity.
Judy married Philip Dunn in May of 1979, at which time he and his three children, Kelly, Shari, and James, moved into the house, each staying for various lengths of time.
Melissa Godwin testified as to the noise, odors, and continuous vibrations from the plant's operation. She stated that because of embarrassment over the odor, she did not bring her friends to the house and did not practice basketball in the yard. Although Melissa testified to having suffered *1271 from both headaches and eye problems at a younger age, the testimony of an optometrist attributed those problems to her being farsighted and to astigmatism, as well as to "eye teaming skills" problems. When Melissa received eye therapy as well as glasses, her vision problems cleared as well as did most of her headaches. The optometrist did not feel that the vibrations caused the headaches, although he opined that they could have contributed to the discomfort.
James Dunn lived in the residence for only a period of six months, but his lasting impression of living there was of noise and odor, both outside the home and inside. He recalled constant vibrations which shook the light fixtures as well as the bed in which he slept. He stated he was never able to sleep normally during his time in the house, although he suffered from no distinct physical injuries.
Stacy Godwin testified that the noise and vibrations from the plant did not affect him physically in any way. His sole complaint was that it often got on his nerves. On the other hand, Kelly Dunn, who lived in the house for a little over a year and a half, testified that he had no problems at all when he lived there.
Philip Dunn testified that during the time that he lived at the house he experienced nausea, headaches, back pain and sleeplessness, as well as irritability. Although he admitted having had back problems and some headaches in the past, he stated that they were of differing duration and intensity prior to the time he moved into the house, when the headaches became a daily occurrence. Philip had been treated on several occasions for headaches in connection with a sinus condition, and for tension vascular headaches between 1966 and 1974. Philip recalled that pictures, light fixtures, lamp shades, and curtains rattled and shook during the cyclical engine operations of the plant. He testified that the vibrations were so intense they blew out light bulbs on a regular basis so that, ultimately, the family simply removed the fixtures to make it easier to change the bare bulbs. According to Philip, the noise transmitted from the plant was so loud on occasions that people could not carry on a conversation in normal voice tones. After two years, Philip moved out of the house when he could no longer stand the noise and vibrations. He was finally joined by Judy in 1984.
Shari Dunn lived in the house for five years. She recalled loud noise and vibrations as well as an offensive smell. The door to her bedroom shook continuously, and she hesitated to go outside into the yard because of the smell and noise. Consequently, as was the case with Melissa, she did not often invite her friends to the house. Shari complained of headaches, although not to her doctor.
Appellees offered the testimony of Dr. Robert S. Kennedy, a psychologist, who was tendered as an expert in the field of the effects of vibration on humans. Dr. Kennedy examined a report prepared for Exxon by the Division of Spectral Dynamics Corporation (DYMAC), and transformed graph recordings produced by DYMAC into the customary vibration terminology of meters per second squared. Dr. Kennedy concluded that the symptoms exhibited by members of the household were due to the effects of vibration, the common symptoms including fatigue, irritability, body sway, posture equilibrium, blurred vision, and a "general distress reaction."
The house began to show signs of damage after about two years. Roger Harris, the contractor of the home, visited the house after Judy began noticing cracks in the exterior walls. On the occasion of his visit, he noticed vibrations and observed a table lamp shaking as well as curtains and windows moving with the vibrations. Harris revisited the house approximately three weeks prior to the trial, at which time he observed very large cracks, specifically in the garage and chimney walls. He further found extensive damage to the basement from water running through the cracks. Despite his experience in masonry contracting, Harris could not assure the success of a repair job as long as the vibrations were present. He opined that due to the extensive damage, there would be additional *1272 damage that was not visible. He felt that there would be stress points within the walls with large cracks, and therefore impossible to tell the full extent of damage until someone actually went in and tore down portions of the house to attempt repair. Harris stressed that the damage he discovered was not the normal cracking known to result from settlement.
Another contractor, Marvin Broadwater, visited the home in 1979 or 1980 and found that certain of the footers were broken, requiring, in order to even attempt repair, that someone excavate to the bottom of the home and start over again. Broadwater returned to the Dunn home the day before his testimony at trial and noticed that the cracks had worsened, especially in the basement and around the chimney. At this time, he also found cracks in the grade beam under the sliding glass window on the patio, and noticed that a corner of the bedroom had settled, indicating that the footer was broken at that point. During the visit, he could feel the vibrations in the house and the solid front door pulsating. He testified that the basement leakage was caused by breakage of the grade beam under the glass sliding doors, which leakage was abnormal from that usually caused by ground water. In his years of experience, Broadwater had never seen settlement as bad as that which he observed in the Dunn residence. He was of the opinion that someone could attempt to repair the home but that in a month or two more damage would show up due to the extensiveness of the damage. Although he felt certain repairs were possible, he could not say that they would correct the problem or return the house to a habitable condition. He itemized the amounts of various repairs obviously needed to be done totaling $40,000 to $50,000.
Appellees also tendered the expert testimony of engineer James Anderson who inspected the residence and concluded that a combination of the sound and vibrations, both airborne and groundborne, from the plant caused the settling of soil beneath and around the house which resulted in the structural damage to the house.
William Byron, a local real estate broker, testified as to the market value of the home. He conducted his appraisal as though the house was in an undamaged condition with the exception of normal wear and tear. In his opinion, the home's fair market value was $95,250, less the $3,000 to $5,000 normally necessary to "spruce up" the house for sale. Again, Byron's opinion did not take into consideration the house in its damaged state.
Following the 3-day bench trial, the judge viewed the Dunn property and the adjoining plant. He entered his final judgment assessing damages totaling $304,750. In assessing the damages, the judge awarded the full market value of the house which would exist in the absence of the nuisance, finding that it would be unreasonable to require appellees to repair the house in light of the fact that the structure could not be warranted against future deterioration. The judge specifically found that the vibrations and noise through the air and ground from Exxon's plant caused severe structural damage rendering appellees' house, at the time of trial, unsafe for human habitation. In addition to the structural damage to the house, he also found that the continual shaking and vibration of doors, windows, appliances, and suspended items within the house caused apprehension and annoyance to each of the residents.
Based on the foregoing, the trial judge concluded that Exxon did not exercise reasonable care toward appellees in preventing the noise, vibrations, and emissions, and failure to do so constituted an unreasonable interference with appellees' peaceful enjoyment, use, and occupation of their home. The noise, vibrations, and noxious emissions were found to constitute a nuisance on the authority of Nitram Chemicals, Inc. v. Parker, 200 So.2d 220 (Fla. 2d DCA 1967), cert. denied, 204 So.2d 330 (Fla. 1967), and City of Lakeland v. Douglass, 143 Fla. 771, 197 So. 467 (1940). The judge found that the damage to the residence is permanent, entitling Judy Dunn to the diminution or depreciation of the value *1273 of the property caused by the nuisance. 66 C.J.S. Nuisances § 175 (1950).
Finally, the judge concluded that the noise and vibrations through the air and ground, and the sulphurous gas emissions, caused personal injury to each of the appellees in varying severity, appellees having suffered damages due to annoyance, discomfort, inconvenience, and sickness during the times of their exposure to those conditions. Nitram Chemicals, Inc. Accordingly, he awarded to Judy Dunn, as owner of the house, damages in the amount of $90,250 for the house and $100,000 for personal damages. Philip Dunn recovered $20,000; Melissa Godwin received $50,000; Stacy Godwin was awarded $25,000; Shari Dunn received $12,500; Kelly Dunn recovered $6,250; and James Dunn was awarded $750.
Exxon now raises three points on appeal. Under point I, Exxon argues the trial court erred in awarding the full value of the home as property damages. Under point II, Exxon contends that the trial court erred in awarding damages for personal injuries. Under point III, Exxon maintains that the trial court erred in awarding damages for appellees' alleged emotional distress. Addressing point I, we hold that the trial court's award of the full value of the house as property damages was based on competent and substantial evidence. Cf. Pearce & Pearce, Inc. v. Kroh Brothers Development Company, 474 So.2d 369 (Fla. 1st DCA 1985). Where the injury to real estate resulting from a nuisance is permanent, the measure of damages is the depreciation in the value of the property. 66 C.J.S. Nuisances § 175 (1950); Nitram Chemicals, Inc. v. Parker.
Exxon would argue that appellees failed to introduce any evidence of the market value of the home in its damaged condition. Absent that proof, Exxon maintains that the judge could not have awarded damages for the loss of the value of the house without making an improper inference that the house was rendered completely valueless by the plant's operations. Exxon also contends that the judge's finding that the house was not safe for human habitation is unsupported by the evidence, since appellees lived there for many years, with some of them admittedly experiencing no physical problems during their time of residence. Exxon also argues that there was no evidence to suggest that the home had no value whatsoever, that it could not be used for some purpose other than human habitation, or at the very least, could not be moved or used for salvage, citing to Fort Lauderdale Transfer and Rigging, Inc. v. Callahan Motor Company, Inc., 446 So.2d 138 (Fla. 4th DCA 1983). We disagree.
There was competent and substantial evidence to support the trial judge's finding that the home had no value following the damage caused by the plant's operation. Exxon's argument that there may be some other purpose for the structure amounts to pure speculation, especially in light of Marvin Broadwater's testimony to the effect that in order to repair the house, one would in all practicality need to rebuild the house. In this instance, we accord the judge's findings the same degree of deference as we would accord a jury's finding on the same issue of fact, and affirm his ruling on damages to the home.
Turning next to point III, we address Exxon's argument that the trial judge could not award damages for appellees' alleged emotional distress without appellees' having shown an initial physical injury. Exxon cites the general rule that compensatory damages for mental anguish alone are not recoverable. Brown v. Cadillac Motor Car Division, 468 So.2d 903 (Fla. 1985); Champion v. Gray, 10 FLW 164 (Fla. March 8, 1985). In so arguing, Exxon misapprehends the rule of law as to the measure of damages in permanent nuisance cases. In Durrance v. Sanders, 329 So.2d 26 (Fla. 1st DCA 1976), this Court recognized that a cause of action for nuisance does not arise from negligent acts but from the annoyances, smoke, odors, et cetera, arising from the proven nuisance itself. The "injury" arising from a nuisance is annoyance, discomfort, inconvenience, or sickness. Nitram Chemicals, Inc., 200 So.2d at 225. The judge did not *1274 here award damages for mental suffering as such, nor specifically for physical illness alone, but for those damages generally caused by a nuisance. Consequently, it was unnecessary for appellees to prove physical impact in order to recover.
Finally, as to point II, Exxon argues that there was no competent and substantial evidence of any physical injuries to Stacy, Kelly, or James, thus rendering the awards to those plaintiffs unwarranted. Exxon also maintains that there was no competent and substantial evidence of causation in regard to the alleged injuries suffered by Melissa or Philip. With the exception of the award to Kelly Dunn, we disagree. As stated above, in an action for damages arising from a nuisance, a plaintiff may recover not only for physical injuries but also for annoyance, discomfort, and inconvenience. The record amply supports on those grounds the awards to all appellees except Kelly Dunn, who specifically testified in deposition he had no problems at all when he lived in the home. Accordingly, we affirm the awards as to all appellees with the exception of the award to Kelly Dunn for $6,250. We reverse on that point alone.
THOMPSON and NIMMONS, JJ., concur.